Center for Biological Diversity Good morning, your honors, and may it please the court, Brian Segee for Appellant Center for Biological Diversity. With me at council table is Camila Cosio, and I'd like to try to reserve two minutes of time for rebuttal, and we'll watch the clock. Thank you. As the government acknowledges in its briefing, the new and substantial information standards for a threshold, non-rigorous, positive 90-day finding on second listing petitions under the Endangered Species Act are not in dispute. Here are the center's second petition to list the Tucson shovelnose snake met these standards, where that petition relied on new information submitted by a leading expert, the Rosen documents. First, they provided a detailed scientifically based differing interpretation of the U.S. Geological Service 2014 Fuzzy Boundary Study, as well as other critiques, and second, a new study that presented a competing habitat model. In rejecting the center's second petition, the Fish & Wildlife Service's decision relies on a cursory and inaccurate mischaracterization of the Rosen documents. In highlighting this lack of rational explanation, the government's briefing includes extensive post hoc rationalizations that under basic principles of administrative law should not be considered by the court. Do you agree, though, that it's got to be more than just you disagree, that for you to carry the day, you have to show that the interpretation by Fish & Wildlife was unreasonable? They were considering information, a reinterpretation of prior information, and they didn't agree with you. Why is that unreasonable? I think that's partially true, Your Honor. The government has characterized our briefing as arguing for a per se finding that any scientific information would compel a positive 90-day finding. But there's two parts to that, and the first is that the government and the Fish & Wildlife Service has mischaracterized those Rosen documents. It's called it a so-called analysis, a rehash of already considered information, and the like. Well, do you think it's unfair to characterize it as a reinterpretation? I agree it's a reinterpretation, and that goes to the first factor, Your Honor, which is the new information standard. And when the Fish & Wildlife Service added that requirement to the regulations in 2016, it got comments with concern about what new information meant. And one of those comments was specifically concerned that it could preclude a new interpretation of existing information. Well, I don't think they're taking the position that you cannot consider a reinterpretation of existing information that existed prior to the initial determination. They're not saying that. They're saying, yes, you can provide that information. They then said they considered it and made a determination that it didn't convince them for your position. So my question is, what was unreasonable about that? I mean, I understand you have arguments about the habitat was such that this particular snake wouldn't go into the upper elevations and all of that. But they considered all that, and they made a determination. Why is that unreasonable? Well, first, Your Honor, I think it goes to the post hoc issue. If you look at the service's decision documents, what is there is extremely minimal. It's essentially limited to one sentence that the service is preferring a way, it preferred an approach that elevates genetics over morphology. So that's a mischaracterization of what the Rosen documents say. But it also goes to, so this is at the 90-day stage we have to remember that it's the threshold stage of the ESA petition process. And so in this case, even just a mere rational explanation would not do. But isn't there a reasonable argument that, as you say, the Fish and Wildlife says, well, the problem with the Rosen interpretation is it's, we think it should be a genetically determined, that's the appropriate way to analyze this. Isn't that a legitimate position, even if you disagree with it? Well, it's not what he said. And also, under the case law, and there is no circuit case law at this time yet, but under the Buffalo Field campaign, the two bison, Yellowstone bison cases that we cited out of the District of D.C., as well as a case out of the Northern District of California, Center for Biological Diversity v. Kempthorne, the court said that the service can't, it can't just provide this explanation. It has to explain how these scientific documents are unreliable, irrelevant, or unreasonable to credit. In other words, that they're basically unscientific or obsolete. And there's nothing approaching that in the record, respectively Judge Seaborg. And even if you accepted the rationales that they provided, again, a mischaracterization, that genetics trumps morphology, that would be in line with those cases where they're simply picking one piece of scientific information over another. They're resolving a reasonable scientific dispute in favor of the service's interpretation of the fuzzy boundaries study. And it's really a very novel and aggressive interpretation. This case is in a little bit different posture than the other cases. It's a bit unique where in most of the cases that we've cited, if not all of them, there's these different scientific studies. And so the petitioners have a study that favors the petitioner. And on the other side, there's science that maybe doesn't favor their position. Here, it's a little bit different where there's this key, pretty densely written, right, genetic study that the service has interpreted in a way to expand the snake's understood range by the fuzzy boundaries study. And when the Rosen interpretation is submitted, that's not peer-reviewed, is it? So the five letters, I'm sorry, the five problems letter was not peer-reviewed. It was correspondence. There's been a little bit of confusion back and forth on the briefing in terms of the Bradley and Rosen habitat model study, and I apologize for that. It wasn't formally peer-reviewed. It was informally peer-reviewed. But that's... What does that mean? I'm not sure I understand. It's basically an informal peer review is sharing it with colleagues. And one of the colleagues that they shared that study with in this case was the author of the fuzzy boundaries study. That doesn't imply that he agreed with all aspects of it. But more importantly, in terms of what can constitute credible information, it doesn't have to be peer-reviewed. And with respect to the Rosen letter, you can analogize that to the Center for Biological Diversity v. Kempthorne case, the Northern District case, where there was competing studies concerning the impacts of old-growth logging on the salamander species that were being petitioned in that case. And one of the pieces of substantial information was a letter, similar to the letter here, where a scientist basically explained why he believed that the studies showing that old-growth logging negatively impacted the salamanders was superior. But again, at the 90-day stage, it's not a question of which piece of science is superior, because it's at the first stage of the process, and in the campaign case, which is the second Yellowstone bison case, the court noted that the service can't be expected to resolve reasonable scientific disputes at the 90-day stage. And so I don't think it's true that the service, it may be more true at the 12-month stage, that the service can kind of choose a piece of scientific information over another, where it provides a rational explanation. Here, again, there's not a rational explanation. I don't even know if it could pass muster at the 12-month stage. It certainly does not come close to the 90-day stage, where they, I mean, basically, they would have to say that what Rosen presented in his two documents is completely unscientific and unreliable. And that's just not the case. And to go back to the interpretation that the service put forward, it tripled the snakes' range. It extended it 200 miles to the west, to the California border. It encompassed these large areas of federal public lands that are not subject to the same development pressures as the snakes' previously understood range. And Rosen wrote, and he said, just look at the language of the study, and it doesn't support that. A few examples. He talked about how the study specifically says La Paz County, the westernmost county snakes, are assigned to this Colorado subspecies, based on the nuclear DNA data. Talks about Maricopa County being the presumed transition between the Colorado and the Tucson subspecies, which also cuts against this notion that Tucson extends all the way to the border. And another, fuzzy boundaries, and the other thing, the other main characterization that the service has said throughout this case is that, again, this simple characterization of Rosen in our petition saying coloration trumps morphology. And that isn't the case. And fuzzy boundaries. They picked out one piece of the nuclear DNA data set. There was another nuclear DNA data set. There was the mitochondrial DNA. And yes, there was morphology as well. And he said that all of those should be considered together. And the service never explained how is that completely unscientific. They just said, again, mischaracterizing his position, that no, genetics trumps coloration. So it's obviously in complex territory where I could see the court sort of naturally being inclined. Was Rosen's position just his interpretation of the data, or was he also pointing to other scientific principles that supported his position? Well, there was different parts of his critique. And so some of it was just simply interpreting the study, looking at the language and saying the service missed these, you know, the service tries to paint it as if their expansion of this range wasn't even an interpretation of the data. It was sort of this inescapable conclusion. And so he pointed out all these different ways. And again, that goes back to what the service said about the meaning of new information in those 2016, when it added it in 2016. It said you don't need new studies or new data. It can be a different interpretation. And here you have this leading expert on this, perhaps the leading expert on shovel-nosed snakes reading the study and saying, you know, respectively to U.S. Fish and Wildlife Service, here's all these ways that your study is wrong. Could you reconsider it? And they did not. And on the plain language, and then also based, again, on this multi-factor approach, which finds support in the record, including the lead author of Fuzzy Boundaries, his prior mitochondrial study in taking an approach that relies on one piece of genetic evidence. These are very complicated. It's evolution. So it's basically like look at all of the evidence together. But I would just, and then to touch briefly on the Bradley and Rosen model, that was a new study. That wasn't a new interpretation. They had reasons for rejecting it. But again, how can you say this study was not reasonable? They looked at different factors that the service did. Had detailed critiques of why, even if you accepted this vastly expanded range, why the land within it? He pointed out, I know this land very well. There's no way snakes exist where you say they exist. But also took this detailed factor approach, which they validated with species records, and said the elevation that they've ever been seen in Arizona. There's no response to that in the record. So that comes back to the lack of rational explanation. I see I'm down to a minute, Your Honor. Do you want to reserve? Good morning, and may it please the Court. My name is Joan Pepin on behalf of the Fish and Wildlife Service. The parties are in agreement that the Fish and Wildlife Service's role at the 90-day stage is to decide whether the petition presents substantial scientific information. In a case like this one, where there has been a previous finding on the species, that information has to be information that was not previously considered, and that information has to indicate that listing may be warranted. The regulations governing the 90-day finding specifically state that conclusions drawn in the petition without the support of credible scientific or commercial information will not be considered substantial information. Now, the service made a finding that there was, on the critical issue of where is the range of this species, which is the linchpin for their argument, that they did not present any new or substantial information. And that finding is on page 25 of the excerpts, contrary to what the other side is arguing. There is an explanation. There is an explanation both in this final document and in the petition review form, which supports it. The service explained that as they had found in 2014, the color, this species, the western shovelnose snakes, is a highly variable species with respect to its color patterns. And so color patterns are an unreliable basis for distinguishing the subspecies. Back when that's the only information that was available, that was used to identify subspecies. But now that we have genetic data as a result of this 2014 study, we have much more information for classifying these snakes. Can you clarify your view of this? You touched on it already, the 90-day stage. Your colleague says, well, the field knows more about the snakes here than many. And he's presenting a new interpretation. That should be enough at 90 days to get to the next phase, which I guess is the 12 or whatever, 12-month, I forget what it is. It seems indisputable that there is a serious person who is advancing an interpretation at this 90-day stage. Why shouldn't that get you to the next stage? As we tried to explain, words like analysis or interpretation can be used to describe a wide range of writings. But it has to be not conclusory. It has to be scientific. And as we've tried to explain, and as you can see, if you look at the Rosen letter and the habitat study, there is no explanation of why color is a better basis for identifying the subspecies. As I understand it, they say, for example, well, putting aside the color as the basis for making the determination, they say, well, your position has the habitat in areas where this snake simply can't survive, up at elevations that the snake never goes. So, you know, doesn't that call into question the analysis that Fish and Wildlife credited as to the range of this snake? No, that's really a separate, the question about the elevation, I'll address that in a moment, but the fundamental question is, is this species limited to the area where it represents a certain color pattern in the far eastern portion of its range? Or do we define the snake by genes that goes west to the California border? And on that, the service clearly followed the recommendations and the science in the Fuzzy Boundaries studies. Now, the plaintiffs have argued that there is no such finding in the Fuzzy Boundaries study, and I just want to point you to exactly where it is, on page 259 of volume three of the excerpts. This study concludes, we recommend retention of the names Anulata and Cloudberry, that's the Colorado shovelnose snake and the Tucson shovelnose snake, as subspecific designations, as subspecies, within C. anulata that conform to the patterns of genetic structure, i.e., Colorado and Sonoran clusters, respectively. They recommended that the Tucson shovelnose snake, Cloudberry, be defined by the Sonoran cluster. If you look on page 255 of the excerpts of record, here's a map of where that Sonoran cluster is. As you can see, it extends into La Paz County by the California border. They also explain on page 254 that both microsatellite DNA analyses extend into Pinal, Maricopa, and northern La Paz counties. So I don't, I think it's clear that the service properly interpreted Fuzzy Boundaries. Now, if Mr. Rosen, Dr. Rosen, who, there's no question about his expertise, the service has relied on his work in the past often, but the question is, did these particular documents present substantial scientific information indicating that the species should be listed? And the answer is no, on the issue of range. On the issue of range, they presented nothing more than conclusory statements that you ought to layer these data sets in such a way to replicate the color-based range. No explanation of why that's better. No explanation of why the science, you know, indicates such a finding. And then in the habitat study, they basically did what they said should be done. They took, they kind of cherry-picked the genetic data, and then took the intersection of it, so sort of the smallest bit of the Venn diagram, and said, that's the range. And then within that range, they did, you know, a series of measurements. They did a lot of habitat research that we have no real quarrel with, but found that it was all within a part of the range where the service had already found pretty much the same thing in the 2014 study, in the species status assessment. The findings with respect to habitat in the very narrow portion of the range that the habitat study considered are simply cumulative, repetitive of what was already found in the species status assessment, specifically that the habitat in that area was under significant pressure from urban development, agricultural development, and the things that go along with this. But what they found was, and this still holds true, is that when you define the snakes by genetics, which is the scientifically preferable way to do it for the reasons that they explained, both in this 90-day decision and in the 2014 decision, there's vast areas of range that are protected. And so this snake is simply not in danger of becoming extinct, which is what it means for listing to be warranted, because it has vast areas of protected range, even if some areas of habitat in the extreme eastern portion of its range are under development pressures. I'd like to briefly address two things. The argument that these explanations are post hoc. Post hoc is when the agency does not offer an explanation, or when the explanation offered in litigation is different than the explanation offered by the agency. The agency, on page 20, I would say 24, a bunch of pages, 24 to 25, that's the Federal Register finding, and then 45 to 46, made findings that this information that was presented with respect to range was not substantial scientific information. And they explained why genetics is a better basis for identifying subspecies. How with the tremendous variation in colors within the whole species complex, all of the western shovelnose snakes, the Colorado shovelnose snake as well, that you just can't tell what kind of snake it is by color pattern, genetics, are the better basis. And as the service explained, the petition did not contain any substantial or new information that indicated otherwise, just conclusions. So we have, you know, shown how the services finding is supported by the record, and that is how record review works. The APA provides that the court is to consider the whole record or the parts of it cited by a party. And we are simply showing that the services finding is supported by the record that is not post hoc records. And that's a rationalization. I'd also just like to point out that in Buffalo Field Campaign, two important differences. One is that the court explicitly held in that case that the agency offered no explanation whatsoever for crediting one decision, one study over another, both of which post dated their previous finding. In this case, the service has offered an explanation. It's explained why color pattern is better. Color pattern is not better. And the other thing to point out is that case was, it was decided after the new regulations, but the agency decision was before. So it didn't use the new regulations that flesh out a little better what's required at the 90-day stage. And what's required at the 90-day stage is credible scientific information not previously considered, indicating that listing may be based on the critical range issue. All that was presented were conclusory statements with no scientific analysis to back them up. And that is simply not enough to require the service to do a do-over of a decision that it has already made. No further, the court has no further questions. I'll yield my time. Very well, thank you. Your Honor, a brief rebuttal. The service hangs its hat on the statement that my friend quoted in terms of dividing the populations by Colorado and Sonoran clusters, but this is again going to what Rosen was focused on. Rosen pointed, and this is the lead paragraph of our petition, that on page 3 ER 258, there is a statement that says, and this is the date of the record, it specifically says that the La Paz County snakes, those are the furthest western snakes, are assigned to the Colorado subspecies. And so it's, Rosen was advocating for a holistic interpretation of the study. The service accuses us of cherry picking one set of DNA data, or I'm sorry, one set of, well, yeah, with the Bradley and Rosen, one set of data, but that's exactly what the service did with its finding. They picked out one set of data to the exclusion of all others. With the alternative hypothesis with the importance of morphology, not the elevation of morphology, Rosen actually did provide a detailed hypothesis on why that was important at the last three pages of his five questions letter. And with regards to post hoc, my friend on the other side did a good and detailed job, far better than the service. In her briefing, explaining the reasons why the decision should be not overturned, but those explanations are largely untethered. Again, the service did not come close to explaining how it was unreliable, irrelevant, or unreasonable to credit. If there's no further questions.
judges: PAEZ, OWENS, Seeborg